Filed 7/27/26  P. v. Yang CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MENG YANG,<br><br>    Defendant and Appellant. | C103019<br><br>(Super. Ct. Nos. 23CF05815, 23CF06242) |

Defendant Meng Yang appeals following his no contest pleas to first degree burglary, arson of a structure, and assault with a deadly weapon.  He contends the trial court abused its discretion by denying his request for pretrial mental health diversion.  He also argues the court improperly stayed a sentence enhancement after indicating its intent to strike the enhancement.  The People argue that defendant has failed to establish that the court abused its discretion by denying diversion but concede that defendant's sentence should be modified to conform to the plea agreement and the court's expressed intent to strike the additional punishment for the enhancement.  We will modify the judgment and affirm as modified.

1

## BACKGROUND

We recite the facts relevant to defendant's request for pretrial mental health diversion in light of the standard of review. Under the abuse of discretion standard, "[t]he trial court's findings of fact are reviewed for substantial evidence." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; accord *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079.) " 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 450.)

One night in June 2023, around 9:30 p.m., a homeowner heard a truck pull up to his house. After walking out of his bathroom, he found defendant in the hallway. Defendant told the homeowner that they were supposed to meet there, shook the man's hand, and asked him to confirm something. The homeowner responded that he did not know defendant and saw defendant holding phone chargers that had been sitting on a table in the living room. The homeowner escaped out the back of the house and called 911. By the time law enforcement arrived, the homeowner noticed that his car keys were missing.

A California Highway Patrol officer detained defendant in the driveway. Defendant told an officer from the Siskiyou County Sheriff's Office that "the feds were up in the sky" and his mission was to find the "supra." The officer asked defendant if he had taken anything from inside the house, and defendant said that he had been informed that he was "getting new gadgets," so he took wireless headphones from the house. The officer asked again, and defendant said he took car keys because he was at the house "to swap cars." After further questioning, defendant told the officer that a radio station had told him to come to the house. The officer searched a bag on the hood of defendant's truck and found the wireless headphones and a phone charger. The homeowner later found his car keys on the ground near the driver's door.

2

Four days later, the People charged defendant with first degree burglary in case No. 23CF05815, and the trial court released defendant on his own recognizance, subject to his agreement to report to the probation department. Four days after defendant's release, just after 9:00 a.m., the Siskiyou County Sheriff's Office dispatched a sergeant to investigate a reported structure fire and possible arson. On the way, the sergeant heard that the California Highway Patrol believed they had found a suspect, so the sergeant dispatched another officer to the suspect's location. At the scene of the reported structure fire, the sergeant found a 6,000-square-foot pole barn full of hay bales engulfed in flames. The metal roof had already melted and collapsed. Firefighters were gathering and planning how to contain and extinguish the fire.

Another officer then arrived and directed the sergeant to the site of a second apparent arson. At the other location, the residents reported seeing defendant's truck parked near some hay bales and confronting him. As the residents approached, they saw smoke coming from a hay bale. They jumped a fence and extinguished the flames, finding a burning pair of men's boxer shorts tucked into the twine of the bale. Defendant sped off in his truck but reached a dead end, so he had to turn around and pass the property again. Two men tried to stop defendant but he accelerated and swerved at one of the men, nearly hitting him before driving away.

A California Highway Patrol officer stopped defendant's truck and detained defendant approximately 25 minutes after the initial report. Officer Darren Stewart from the Department of Forestry and Fire Protection (CAL FIRE) then arrived and questioned defendant about the fires. Defendant stated that he had been following someone named "T" who carries semiautomatic rifles around because someone told him T was going to kill someone. Defendant followed tire tracks to the hay barn and went inside. He said that he had to burn the hay barn because his phone did not work and a radio station told him to get the attention of law enforcement to help stop T. Defendant also stated that he used boxer shorts to start the second fire because the hay was too wet to ignite using his

3

lighter alone.  In his analysis of the hay barn fire, Officer Stewart noted:  "This fire could have potentially caused a large wildland fire or spread to another nearby hay barn."

Following the fires, the People charged defendant with arson of a structure, two counts of arson of property of another, possession of flammable material, and assault with a deadly weapon and alleged that he had committed the offenses while released on his own recognizance within the meaning of Penal Code section 12022.1.[1]

In March 2024, defendant filed an application requesting pretrial mental health diversion pursuant to section 1001.36.  Defendant listed two mental health diagnoses: "[a]djustment disorder with mixed anxiety and depression" and "[m]ethamphetamine use disorder in early unstable remission in a controlled environment."  He alleged that there was "a relationship between the criminal conduct and [his] mental health disorder at the time of the conduct," but did not specify which disorder was related to the offenses.

Along with his application, defendant submitted a diagnosis and treatment plan prepared by a social worker from Siskiyou County Behavioral Health.  Defendant reported to the social worker that he had been using methamphetamine since 2021 and, prior to his incarceration, he used it every day.  Defendant stated that he felt like he needed it "or else [his] brain [was] going to explode because too many things were running through [his] mind."  The social worker noted that defendant had experienced symptoms of psychosis for the first three months of his incarceration, for example, he felt as though television shows and commercials were talking to him and telling him things and he felt that the "feds" were talking to him or trying to get him.  He heard the feds talking to him when he listened to the radio, giving him hints or sending him coded messages.  As time went on, his mind cleared, which led defendant to conclude, "Maybe it was just the drugs."  After discussing the fires he started, defendant commented:  "Now

---

[1]      Undesignated statutory references are to the Penal Code.

4

that I'm not on drugs anymore I wonder if all [those concerns about a dangerous person named T and signaling the feds] was in my head. I wonder if there is any way I can find out if I was being investigated by the feds or if the feds were really trying to communicate? Was it just a coincidence that I saw T-dog? It all felt very real to me."

The social worker concluded that defendant was "at imminent risk of relapse outside of a controlled environment, as he has no foundation of recovery skills[,] no previous period of sobriety[, and] … no sober support network." Specifically, she noted that defendant had tried to quit methamphetamine once but was unsuccessful, and his longest period of sobriety was three months while engaged in relationship counseling. The social worker also reported that "his local network consists mainly of other cannabis farmers." Based on defendant's "lack of treatment and his environment" the social worker recommended treatment at a residential facility where he could receive a higher level of care and "establish a network of sober supports and a foundation for recovery before consideration of a lower level of care."

Regarding the adjustment disorder with mixed anxiety and depression, the social worker noted that "his thoughts are specific to his incarceration and worrying about his family while incarcerated." "These symptoms started approximately [three] months into his incarceration and have not been present for more than six months."

The social worker did not offer opinions about whether defendant met any of the criteria for eligibility and suitability for pretrial diversion. Rather, she concluded the report by proposing that, "[i]f [defendant] is deemed to be an appropriate candidate for … mental health diversion," she would recommended he engage in: (1) psychiatric and medication management services, (2) substance use disorder treatment, (3) individual mental health therapy, (4) mental health diversion groups, and (5) case management service to support his compliance. The social worker also noted that defendant would not need supportive housing because he would continue to reside with his brother.

5

The People opposed defendant's request for pretrial diversion, arguing that: (1) the diagnosed mental disorders were "relatively minor and appear to be contrived"; (2) the disorders were not significant factors in the commission of the offenses; (3) defendant did not need mental health treatment; and (4) defendant poses an unreasonable risk of danger to public safety. With their brief, the People submitted reports produced by law enforcement regarding the two incidents at issue in this appeal. The People also submitted evidence that defendant had previously been detained during the execution of a search warrant at an illegal marijuana farm in 2019; had been investigated for a 2020 assault at a casino; and had been detained for trespassing at a casino in 2023.

Defendant later submitted evidence that he had been accepted into a residential treatment program in Placerville. Defendant also filed a reply brief arguing that he had met his burden to show that he was both eligible and suitable for pretrial mental health diversion.

The trial court considered the parties submissions and denied defendant's request for pretrial mental health diversion, finding that: (1) defendant's adjustment disorder was not present at the time of the offenses; (2) his methamphetamine use disorder was not a motivating, causal, or contributing factor to his involvement in the crimes; and (3) he poses a significant and unreasonable risk of danger to public safety because he could commit another arson resulting in murder.

Following the denial of his diversion request, defendant pled no contest in case No. 23CF06242 to arson of a structure and assault with a deadly weapon and admitted that the section 12022.1 enhancement applied because he had been released from custody on bail or his own recognizance at the time of the offenses. In case No. 23CF05815, defendant pled no contest to first degree burglary. Defendant also admitted that two aggravating circumstances applied to his offenses.

6

In return for his pleas, the negotiated plea agreement stipulated he would be sentenced to six years in prison, comprising an upper term sentence of six years in prison for arson of a structure or forest land, with the sentences for the other offenses to run concurrently. The People moved to dismiss the two counts alleging arson of property of another and one count of possession of flammable material, which the trial court granted based on the plea agreement. The agreement also indicated that the maximum prison term for the section 12022.1 enhancement was two years but did not specify how the court would dispose of the enhancement.

At sentencing, the trial court, following the probation department's recommendation, imposed the upper term of six years for arson and "a consecutive two years pursuant to [section] 12022.1 … to be stayed pursuant to section 1385[, subdivision] (b)(1)." The court imposed a concurrent upper term sentence of six years in prison for first degree burglary and a concurrent 60-day sentence for assault with a deadly weapon, for an aggregate term of six years in prison. The minute order for the sentencing hearing indicates that the court struck the section 12022.1 enhancement at the plea hearing when it dismissed the remaining counts. The abstract of judgment form indicates that the trial court stayed the enhancement.

Defendant filed a timely notice appealing from the judgment and obtained a certificate of probable cause to challenge the denial of his request for pretrial mental health diversion.

## DISCUSSION

### I. Pretrial Mental Health Diversion Eligibility

Defendant contends the trial court abused its discretion by denying his petition for pretrial mental health diversion. The People properly concede that defendant was eligible for mental health diversion because his methamphetamine use disorder presumptively

7

was a significant factor in the commission of the offenses.[2] However, the People contend the court did not abuse its discretion when it determined that defendant was not suitable for diversion because he would pose an unreasonable risk of danger to public safety. On this issue, defendant contends the record lacks substantial evidence that he would pose an unreasonable risk of committing a "super strike" offense if treated in the community.[3] We conclude substantial evidence supports the court's decision.

When reviewing a decision regarding pretrial mental health diversion under the substantial evidence standard, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Gerson, supra*, 80 Cal.App.5th at p. 1079.) "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*Ibid.*) " ' "We do not reweigh evidence or reevaluate a witness's credibility." [Citations.] "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support [a trial court's factual finding]." ' [Citation.] ' " 'To

---

[2] We reject defendant's argument that he is eligible for mental health diversion based on his adjustment disorder. "To support a diversion request, the condition in question must exist at the time of the offense." (*People v. Braden* (2023) 14 Cal.5th 791, 814.) Defendant developed an adjustment disorder three months into his incarceration, caused specifically by the stresses of his incarceration. This condition could not have contributed to his commission of the offenses three months prior when he was not incarcerated.

[3] Defendant does not contend the trial court departed from applicable legal standards or acted arbitrarily and capriciously, so we do not consider those aspects of the abuse of discretion standard. (See *Haraguchi v. Superior Court, supra*, 43 Cal.4th at pp. 711-712.)

warrant the rejection of the statements given by a witness who has been believed by [the trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' [Citation.] Conversely, the trier of fact generally may reject even uncontradicted testimony, whether by lay or expert witnesses, so long as the rejection is not arbitrary." (*Id.* at pp. 1079-1080.)

Under section 1001.36, subdivision (a), a trial court may only grant pretrial diversion to a defendant if the court finds the defendant satisfies the requirements for eligibility under subdivision (b) and suitability under subdivision (c). Under subdivision (c)(4) of section 1001.36, a defendant is not suitable for diversion if the defendant will "pose an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community." Section 1170.18 defines "unreasonable risk of danger to public safety" as "an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).) Section 667, subdivision (e)(2)(C)(iv) lists offenses known as "super strike" offenses and includes, as relevant here, "[a]ny homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive." (§ 667, subd. (e)(2)(C)(iv)(IV).) The relevant homicide offenses here would be malice murder or attempted murder or, more likely, felony murder while perpetrating or attempting to perpetrate arson. (§§ 187-189.)

For an unintentional homicide to be felony murder, and thus a "super strike," the perpetrator must: (1) be the actual killer, (2) aid and abet a first degree murder with the intent to kill, or (3) be a major participant in the underlying felony and act with reckless indifference to human life. (§ 189, subd. (e).) In determining whether a defendant poses an unreasonable risk to public safety if treated in the community, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and

9

criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Here, substantial evidence supports the trial court's determination that defendant posed an unreasonable risk of committing a "super strike," in this case murder or felony murder in the perpetration or attempted perpetration of arson. The parties agree that defendant's long-term methamphetamine use led to a psychosis that caused him to hear voices telling him to light things on fire, which defendant then did. This is confirmed by defendant's reports to the police and to the social worker and by the fact that his psychosis faded after three months of enforced sobriety in jail. CAL FIRE Officer Stewart's analysis of the hay barn fire concluded that the fire "could have potentially caused a large wildland fire or spread to another nearby hay barn." This is a sufficient basis to infer that if defendant relapses into methamphetamine use, he could start a large wildfire or structure fire that could result in a death that would qualify as a "super strike."

The remaining link in the logical chain is whether defendant is reasonably likely to relapse, and substantial evidence supports the court's determination that he is likely to do so. As the social worker who evaluated defendant explained, he is "at imminent risk of relapse outside of a controlled environment, as he has no foundation of recovery skills[,] no previous period of sobriety" and "no sober support network." Defendant had been using methamphetamine for years, had tried to quit once unsuccessfully, and his longest self-reported period of sobriety prior to incarceration lasted for just three months. The social worker also reported that defendant would continue to reside with his brother upon release, which was the exact setting that put him at imminent risk of relapse. Because substantial evidence supports each part of the trial court's determination that defendant poses an unreasonable risk of committing an arson resulting in murder if treated in the community, we affirm the order denying mental health diversion.

10

Defendant faults the trial court for failing to "explain what in the record supports the denial, or what was relied upon." As noted above, appellate courts uphold a trial court's ruling under the substantial evidence test " 'if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.' " (*People v. Armstrong*, *supra*, 1 Cal.5th at p. 450.) Once the appellate court "is satisfied that substantial evidence exists to support the … finding, its examination ceases at once." (*In re Estate of Moore* (1912) 162 Cal. 324, 326.) Here, the trial court reviewed the information the parties provided in their briefing and found that defendant posed an unreasonable risk of committing a super strike, and substantial evidence supports that finding. This ends our inquiry; we do not further scrutinize the trial court's reasoning.

The parties also argue about the relevance of *People v. Pacheco* (2022) 75 Cal.App.5th 207, which similarly involved a defendant who abused methamphetamine and committed arson in a wildfire prone area. We agree with defendant that the facts of *Pacheco* are distinct and caution that, "[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) To the extent that *Pacheco* posits that methamphetamine abuse and a history of arson can create an unreasonable risk to human life, we agree that such inferences are reasonable, as explained above. (See *Pacheco* at p. 214.) Beyond that, the factual distinctions between the cases make *Pacheco* less valuable to our substantial evidence analysis in this case.

*II. Striking the Enhancement Pursuant to the Plea Bargain*

Defendant next contends that we should correct the judgment to strike the enhancement imposed pursuant to section 12022.1 because he had been released from custody on bail or his own recognizance at the time of the arson. The People largely agree, arguing that we should strike the punishment for the enhancement because the trial court invoked section 1385, subdivision (b)(1) when purporting to stay the enhancement.

11

"Ordinarily, an enhancement must be either imposed or stricken 'in furtherance of justice' under … section 1385." (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364.) Section 1385, subdivision (b)(1) adds that, "[i]f the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a)." "The trial court has no authority to stay an enhancement, rather than strike it—not, at least, when the only basis for doing either is its own discretionary sense of justice." (*Lopez,* at p. 364.) There are exceptions to this rule that permit courts to stay the punishment imposed for an enhancement, for example section 654 and rule 4.447 of the California Rules of Court. (*Lopez,* at p. 365.) These exceptions are not discretionary; they are "limited to the situation in which an enhancement that *otherwise* would have to be either imposed or stricken is barred by an overriding statutory prohibition. In that situation—and that situation only—the trial court can and should stay the enhancement." (*Ibid.*)

According to the transcript of the sentencing hearing, the trial court here relied on section 1385, subdivision (b)(1) when it purported to stay the section 12022.1 enhancement. It does not appear that any overriding statute prohibits imposition of the enhancement in this case. As a result, the court lacked the authority to stay the enhancement. In general, we presume a trial court knew and followed the law. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) Based on the statutory provision cited by the court, we conclude the court intended to strike the punishment for the enhancement rather than imposing an unauthorized stayed sentence. The minute order from the sentencing hearing supports this conclusion by indicating that the court struck the enhancement, though it suggests the court did so at a prior hearing, which is not supported by the transcript. We will modify the judgment accordingly.

12

**DISPOSITION**

The judgment is modified to strike the punishment for the section 12022.1 enhancement. The trial court is directed to prepare an amended abstract of judgment indicating that the punishment for the enhancement was stricken, not stayed, and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

/s/
WISEMAN, J.*

We concur:

/s/
ROBIE, Acting P. J.

/s/
FEINBERG, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.